**SCHROEDER**

v.

**VIGIL–ESCALERA PEREZ.**

Court of Common Pleas of Ohio,
Cuyahoga County,
Division of Domestic Relations.

No. D–238549.

Decided Nov. 9, 1995.

*Joyce E. Barrett,* for plaintiff.

*Herbert Palkovitz,* for defendant.

CHERYL S. KARNER, Judge.

This matter came on for hearing on September 8, 1995 pursuant to the defendant's motion to dismiss under Civ.R. 12(B), R.C. 3109.21 *et seq.* ("UC-CJA"), The Hague Convention on Civil Aspects of International Child Abduction and/or Forum Non Conveniens. Present at the hearing were the plaintiff, Kimberly Ann Schroeder, and her attorney, Joyce E. Barrett. The defendant,

Alberto J. Vigil–Escalera Perez, did not appear, although his attorney, Herbert Palkovitz, was present and had an opportunity to cross-examine and call witnesses.

The court makes the following findings of fact and conclusions of law:

## I.  Statement of Facts

1.  On February 1, 1995, the plaintiff/mother filed this present action for legal separation and other equitable relief.  The defendant/father was served with the complaint by registered mail on February 13, 1995.  On March 8, 1995, the plaintiff/mother filed a motion seeking temporary custody, which motion was served by registered mail on the defendant/father on March 21, 1995.  On May 16, 1995, the defendant/father filed a motion to dismiss this present action, asserting for the first time The Hague Convention, and that the child had been wrongfully abducted and/or retained in Ohio.  On July 6, 1995, the defendant/father filed a Hague Convention action in federal court seeking the return of the minor child (case No. 195CV1480, United States District Court, Northern District of Ohio).

2.  Plaintiff Kimberly Ann Schroeder is a citizen of Ohio and the United States.  Defendant Alberto J. Vigil–Escalera Perez is a citizen of Madrid, Spain.  In September 1991, the parties met in Cuyahoga County, where both were students at Baldwin Wallace College.

3.  The defendant finished his education at Baldwin Wallace and accepted a job in Mexico, where he moved in September 1991.  The plaintiff remained in Ohio to finish her education.

4.  The parties continued to see each other and became engaged on Christmas in 1991.  Plaintiff moved to Mexico in July 1992 to be with the defendant.

5.  On April 10, 1993, the parties were married in Guadalajara, Mexico.

6.  Shortly thereafter, the plaintiff became pregnant with the parties' only child, Gabriela, who was born on February 23, 1994 in Guadalajara, Mexico.  The child is therefore a citizen of the United States, Mexico, and Spain.

7.  From July 1992 until July 1994 when she left Mexico, the plaintiff was in Mexico on a tourist visa, which required her to return to the United States every six months.

8.  In March 1994, soon after the birth of their child, the defendant began looking for employment in Spain, where his family resided.  Plaintiff indicated to defendant her reluctance to leave North America.

9.  In June 1994, the parties with their infant daughter went to Madrid to visit defendant's family and for defendant to have a second job interview.  Upon their

return to Mexico, defendant advised his wife that he was going to take the job in Spain and that they would all move there. The plaintiff and defendant then spent the next few weeks packing up their belongings in Mexico to be shipped to Madrid.

10. On July 17, 1994, on their way to Spain, the plaintiff and the minor child stopped in Berea, Ohio, to visit with the plaintiff's family. The defendant joined them on August 2. On August 12, 1994, the parties and the child left Ohio to make their home in Spain.

11. Although the parties had intended to make their home in Madrid, Spain, for at least the time being, plaintiff had moved somewhat reluctantly. Not surprisingly, the plaintiff became discontented and, on November 12, 1994, with the consent of the defendant/husband, the plaintiff and the minor child left Madrid for a visit in Ohio with plaintiff's family. The plaintiff had a round trip ticket for a return to Madrid on December 28, 1994.

12. Upon the plaintiff's and minor child's arrival in Ohio in November 1994, it soon became clear that the relationship between the plaintiff and defendant was in trouble. Many conversations via telephone took place between the plaintiff and defendant during November and December 1994. Both parties vacillated in what they wanted to do about their marriage and family. The plaintiff wanted the defendant to move back to North America and live in the United States with her and the minor child; the defendant wanted plaintiff to move back to Spain with the minor child. It became very clear that both parties were having a difficult time adjusting to the cultural differences between Europe and the United States. The parties, during that period of time, discussed separating.

13. It is also clear from the evidence that at no time had the plaintiff wrongfully detained or retained the minor child in the United States. The defendant had encouraged the plaintiff to go to the United States, albeit for a visit; but at no time did defendant insist that the plaintiff return to Spain with the minor child. Rather, during this period of time, the parties were trying to determine how to work out their own problems with their relationship. When it became clear that the plaintiff was choosing to remain in the United States, the defendant decided to seek a divorce from the plaintiff; and in fact on January 27, 1995, he filed for divorce in Madrid; plaintiff was not served with these proceedings until March 12, 1995.

14. The plaintiff filed this action for legal separation (with her subsequent request for custody) on February 1, 1995. The defendant was served with this present action on February 13, 1995 (although defendant is contesting the adequacy of service of process, which will be discussed herein).

15. From November 1994 and continuing even until the date of this hearing, the parties have had frequent and extensive telephone contact with each other, where they have discussed their marriage and their child. The defendant/father has even told the plaintiff that she should have custody of the minor child as long as they could work out visitation once Gabriela was old enough to travel.

16. Defendant is an international commodities broker who travels throughout Europe.

17. During their many conversations, the defendant also indicated to plaintiff that he would not ask her to return to Spain, since his job would require him to travel a great deal throughout Europe. In May 1995, the defendant told plaintiff that he was in love with another woman and he did not want the plaintiff coming back to Spain.

18. At all times, the defendant has known the whereabouts of the plaintiff while she has resided here in Ohio. In June 1995, the defendant was in Connecticut, but made no attempt to telephone or visit with the minor child while in the United States.

19. The father has not contributed to the support of the plaintiff/mother or the minor child. When the plaintiff left Spain she took approximately $1,500. During the ten months she has been away from the defendant, defendant has sent no money for the support of the minor child, nor did he even acknowledge Gabriela's first birthday in February 1995.

20. Since the defendant has chosen not to participate in the hearing, there was no testimony contrary to plaintiff's recitation of the facts. The court is therefore compelled to find that the child has not been wrongfully retained in Ohio. The plaintiff left Spain with the permission of the defendant. The defendant has known at all times where the plaintiff and child were. The defendant has acquiesced in plaintiff's living in Ohio with the minor child and has not urged the plaintiff to return with the minor child. In fact, it was not until more than six months after plaintiff and the child arrived here that the defendant even raised the issue of The Hague Convention, alleging that the child had been wrongfully retained in Ohio and should be returned to Spain. The federal district court action was not filed until July 6, 1995, seeking the return of the child.

## II. The Hague Convention

21. The Hague Convention on the Civil Aspects of International Child Abduction was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to insure their prompt return to the state of their habitual residence." The Hague Convention, Preamble. The Hague Convention recognizes the harm done to children by parental kidnaping and a strong desire among those signatory

countries to implement an effective deterrent to such behavior. Both the United States and Spain are signatory nations. The United States has implemented The Hague Convention in the International Child Abduction Remedies Act ("ICARA"), Section 11601 *et seq.*, Title 42, U.S.Code. The ICARA provides that state courts and United States district courts have *concurrent original jurisdiction of actions arising under the convention.* See Section 11603(a), Title 42, U.S.Code.

■ 22. Under The Hague Convention, when both countries are signatories and the child is under sixteen, a person seeking the protection of The Hague Convention must show by a preponderance of evidence that the child was wrongfully removed or retained from the child's place of habitual residence. In order to determine in this case whether or not Spain should be the country for purposes of determining custody and the return of the child, this court must look at two issues: (1) Is Spain the habitual residence of the infant Gabriela? and (2) Was the removal of Gabriela from Spain or her retention in United States wrongful?

23. Since there is no actual custody decree issued by any court (either from Spain or from the United States), this court is relying on the defendant/father's statement in his affidavit that he was entitled to custody under Spanish law. There was actually no evidence presented on this issue. No translation of any Spanish law was presented to the court and in fact there was no testimony by the defendant that he was entitled to custody under Spanish law, since he was not present at the hearing. Nonetheless, the court will consider The Hague Convention issues.

24. The threshold issue that must be addressed in all cases involving The Hague Convention is where is the habitual residence of the minor child. Is the habitual residence of the child Spain as argued by father or is it the United States as asserted by mother? The father argues that the parties together decided to move from Mexico to Spain, that they had a settled intent to reside in Spain, and that prior to the child's arrival in the United States in November 1994, the only country that could have been Gabriela's habitual residence was Spain. The court finds that prior to November 12, 1994, there is no question that Gabriela could not have been a habitual resident of the United States. Her first five months of life had been spent in Mexico, and the next three months of her life had been in Spain.

■ 25. Defendant argues that the date we must look at is November 12, 1994 and that we must ignore any actions or facts after November 12, 1994. As the Sixth Circuit stated in *Friedrich v. Friedrich* (C.A.6, 1993), 983 F.2d 1396, 1402: " * * * habitual residence can be 'altered' only by a change in geography

and the passage of time, not by changes in parental affection and responsibility. The change in geography must occur before the questionable removal[.]" The *Friedrich* court wanted to make sure that courts would not consider questionable or wrongful removal as an action that would alter habitual residence. Otherwise The Hague Convention would be rendered meaningless.

26. However, the case now before this court is very different from *Friedrich*, since the child was removed from Spain with the knowledge and consent of the defendant/father. Surely in any case where a child is removed from one country to another country with the consent and acquiescence of the other parent, a residency change can result, thus changing the habitual residence of the child. In the case at hand, while it is true the plaintiff and her baby had return tickets, it became very clear during the next several months that marital problems existed, and that the defendant/father vacillated in his desire to have the plaintiff return to Spain. It is clear the defendant acquiesced and agreed that the plaintiff and child could remain in the United States.

27. As instructed in *Friedrich* it is clear that the focus in these cases should be on the child, not the parents, and that past experience, not future intentions, must be examined. That, however, is difficult to do when an infant is of such tender years: Gabriela was only five months old when she moved to Spain, and eight months old when she left Spain. The question then becomes whether the time from November 12 to February 1 when the plaintiff filed her action for legal separation, an eighty-day period, constitutes sufficient contact by Gabriela with the United States to make the United States her habitual residence, or whether the removal and retention of Gabriela from Spain during that time was wrongful, thus triggering The Hague Convention.

28. Considering the evidence and testimony, this court concludes that it was intended that Gabriela remain with her mother in the United States for an indefinite period of time. When the defendant became aware that the plaintiff would not be returning to Spain with the child, he raised no objection and indeed acquiesced in the plaintiff's remaining in this country.

29. As the court found in *Slagenweit v. Slagenweit* (N.D.Ohio 1993), 841 F.Supp. 264, it is sometimes difficult to determine when the allegedly wrongful retention of the child actually occurs. In that case, the child left Germany for the United States in July 1992, pursuant to a joint decision of mother and father. It was unclear when the child would be going back to Germany, which had been the child's residence prior to July 1992. In *Slagenweit*, after discussion between mother and father as to when the child would be returned, it became clear in March 1993, when the divorce petition was first filed in Iowa, that this was the alleged wrongful retention date. In *Slagenweit*, the court found that when the

parties actually began a battle over custody of the child was the date to be used in setting habitual residency. In the case now before us, it was not until May 16, 1995, when the defendant filed his motion to dismiss, that custody became an issue; if there is wrongful retention, it would appear that that is the appropriate date from which to examine retention.

30. There is no actual definition of "habitual residency" in The Hague Convention. The definition most cited by our courts is set forth in a British decision: *In re Bates* (1989), No. CA122.89 (High Court of Justice, Family Division Court, Royal Court of Justice, United Kingdom). The *Bates* court, as cited in *Levesque v. Levesque* (D.Kan.1993), 816 F.Supp. 662, 665, states:

"No definition of 'habitual residence' has ever been included in the Hague Convention. This has been a matter of deliberate policy, the aim being to leave the notion free from technical rules, which can produce rigidity and inconsistencies as between legal systems. * * * It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. *The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions.*" (Emphasis added.) See, also, *Rydder v. Rydder* (C.A.8, 1995), 49 F.3d 369, at 373; *Friedrich v. Friedrich*, 983 F.2d at 1401; and *In re Application of Ponath* (D.Utah 1993), 829 F.Supp. 363, 365, all quoting *In re Bates*.

31. This court, therefore, concludes that Ohio became the habitual residence of Gabriela prior to the filing of this action in February 1995. The parties had mutually agreed that Gabriela would remain in the custody of the plaintiff for an indefinite period in Ohio. The change in geography was not the result of a questionable removal of the child. In fact, there was a clear change in residence from Spain to Ohio. There was a substantial passage of time from the removal on November 12, 1994 to the beginning of the alleged wrongful retention in May 1995. While it may be that the defendant intended the child to return to Spain at some future date, this court is convinced that no definite time for the child's return was set or discussed, and that it was the mutual intent of the parties that the child be with the mother in Ohio for an indefinite amount of time.

32. When determining a child's habitual residence and looking at where a child has been physically present and for what period of time, "[t]he desires and actions of the parents cannot be ignored by the court in making that determination when the child was at the time of removal or retention an infant." *In re Application of Ponath*, 829 F.Supp. at 367. "The intent is for the concept (habitual residence) to remain fluid and fact based, without becoming rigid." *Levesque v. Levesque*, 816 F.Supp. at 665; *In re Application of Ponath*, 829 F.Supp. at 365. "[A] child's habitual residence is the place where he or she has

been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans–Feder* (C.A.3, 1995), 63 F.3d 217, 224.

■ 33. Essentially, then, even if Spain was indeed the habitual residence of the minor child prior to the child's removal on November 12, 1994, there is sufficient evidence that the removal was not "wrongful" as defined under The Hague Convention. Defendant knew at all times where the plaintiff and the child were. Defendant clearly acquiesced in the removal and retention of the child in the United States. In fact, the defendant did not even seek the return of the child until six months after the child was removed.

34. As Article 13 of The Hague Convention states:

" * * * the requested state is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—

"a. the person * * * subsequently acquiesced in the removal or retention[.]"

35. The fact that defendant has made no effort to see or visit with the minor child, although encouraged by the plaintiff to do so, is further evidence that the defendant acquiesced in the retention of the child in the United States. As the court stated in *Ponath*, 829 F.Supp. at 368:

" * * * the Court finds, for purposes of the Hague Convention, that respondent has established by a preponderance of the evidence that petitioner gave his consent for respondent to return to the United States with the minor child. The conclusion is further supported by petitioner's failure, for almost six months, to make any meaningful effort to obtain return of the minor child. Accordingly, the court concludes that removal of the child was not wrongful within the meaning of the Hague Convention."

36. The court therefore finds that under The Hague Convention, the United States is Gabriela's habitual residence.

### III. Service of Process Was Valid

37. The defendant has raised the issue and in fact has filed a motion to dismiss the complaint under Civ.R. 12(B), alleging, among other things, that service of process was insufficient. There is no doubt that the defendant received the pleadings. They were sent to him certified mail at his place of employment, and according to the defendant's own affidavit, a secretary signed for these papers. (Defendant maintains that the secretary who signed for the complaint could not read English and had no authority to accept the service of process on behalf of the defendant.)

38. Civ.R. 4.5 permits service in a foreign country where either Civ.R. 4.3 or 4.4 allows service outside Ohio. As a last resort, defendant could have been served by publication pursuant to Civ.R. 4.4; thus, he may be served under Civ.R. 4.5.

39. It is well-settled law in Ohio that service at a place of employment is sufficient. Service by certified mail can. be properly executed by delivering the service to one other than the named defendant. In *Mitchell v. Mitchell* (1980), 64 Ohio St.2d 49, 18 O.O.3d 254, 413 N.E.2d 1182, a divorce case, service of process was made by certified mail to the address of defendant/wife and signed by another. The Supreme Court stated:

"Similarly certified mail service under the rule does not require that delivery to a person other than the defendant be restricted to a person authorized by appointment or by law to receive service of process for the defendant. All that is required is that certified mail service be consistent with due process standards; *i.e.*, it must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.* (1950), 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] * * *." *Id.*, 64 Ohio St.2d at 51, 18 O.O.3d at 256, 413 N.E.2d at 1183–1184.

40. It is well established that the purpose of service is to give actual notice to a party of proceedings pending against him. Defendant has not argued that he did not actually receive summons and the complaint. It is not necessary for defendant to personally sign for certified mail. Service is deemed sufficient when a return receipt is signed by any person at an address reasonably calculated to give the defendant notice. Where clearly defendant has actual notice of the complaint, it is specious to argue that the service method was not one reasonably calculated to give him actual notice.

41. Certainly sending certified mail to the defendant at his place of employment was consistent with due process standards and certainly reasonably calculated to give him notice of the divorce action. Under the Rules of Civil Procedure, certified mail does not require actual service upon the addressee/party receiving the notice, but is effective upon certified delivery to an "appropriate person." See *Castellano v. Kosydar* (1975), 42 Ohio St.2d 107, 110, 71 O.O.2d 77, 78, 326 N.E.2d 686, 689. In *Lanza v. Lanza* (June 11, 1992), Cuyahoga App. No. 60225, unreported, 1992 WL 136260, the court of appeals affirmed the trial court's finding where certified mail service of process was delivered to defendant/husband's employer.

42. Of course, there can be no better evidence of the actual receipt of the complaint than the motion to dismiss filed by defendant's attorney. In *Kienzle v.*

*Kienzle* (Feb. 10, 1983), Cuyahoga App. No. 45035, unreported, 1983 WL 5754, the court found that the wife's signing of a certified mail receipt for a divorce complaint directed at the husband was sufficient service of process, where the evidence indicated that the husband had notice of the divorce proceedings. In *Perkinswood Market, Inc. v. Limbach* (Aug. 19, 1994), Trumbull App. No. 93–T–4927, unreported, 1994 WL 590312, the court specifically held that:

" * * * It is not necessary that service be attempted through the most likely means of success—ordinarily residence service; it is sufficient that the method adopted be one 'reasonably calculated' to reach its intended recipient. We believe therefore that certified mail service sent to a business address can comport with due process if the circumstances are such that successful notification could be reasonably calculated."

43. This court therefore finds that service of process on defendant was sufficient.

### IV.  Ohio Jurisdiction Over Defendant/Husband for Purposes of Support

44. Sufficiency of service of process as discussed above, however, must be distinguished from the concept of *in personam* jurisdiction.

45. Defendant/husband's only contact with Ohio was when he lived here in 1991 as a student and met the plaintiff/wife, and his brief visit of August 1994 on his way to live in Spain. The court finds that these contacts are not sufficient to obtain *in personam* jurisdiction over the defendant/husband for purposes of division of property and support.

46. Defendant argues, however, that the court is without subject matter jurisdiction. That is not the case. While lack of *in personam* jurisdiction over defendant narrows the relief that may be awarded to plaintiff, it certainly does not eliminate relief altogether. The action withstands defendant's Civ.R. 12(B)(6) challenge.

47. The court certainly has *in rem* jurisdiction over the marriage of the parties in order to grant a legal separation and/or a divorce. "A judgment in an action for divorce is in the nature of a judgment *in rem.* It determines the question of marriage relations, or of personal *status,* as against all the world, and is therefore, conclusive, not only upon the parties litigating in the cause, but upon strangers." *McGill v. Deming* (1887), 44 Ohio St. 645, 11 N.E. 118; *Hager v. Hager* (1992), 79 Ohio App.3d 239, 607 N.E.2d 63. *In rem* jurisdiction therefore vests this court with the authority either to divorce these parties validly or to declare a legal separation.

48. However, with respect to financial issues, it is clear that "[t]he existence of personal jurisdiction * * * depends upon the presence of reasonable notice to

the defendant that an action has been brought * * * and a sufficient connection between the defendant and the forum State to make it fair to require defense of the action in the forum." *Kulko v. Superior Court of California* (1978), 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132, 141. See, also, *Hanson v. Denckla* (1958), 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298, which stated: " * * * it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State[.]"

49. Since child support, spousal support, and division of property are essentially money judgments, they cannot be made absent *in personam* jurisdiction over the obligor. See *Rice v. Rice* (1949), 336 U.S. 674, 69 S.Ct. 751, 93 L.Ed. 957, which found that an ex parte decree of divorce cannot impose orders of support or alimony where the court lacks personal jurisdiction over the defendant. See, also, *Armstrong v. Armstrong* (1954), 162 Ohio St. 406, 55 O.O. 234, 123 N.E.2d 267, and *Brown v. Pugh* (June 29, 1989), Hancock App. No. 5–87–45, unreported, 1989 WL 77017.

## V. Ohio Jurisdiction for Custody Purposes

50. Defendant argues that the same principle that leaves the court without authority to divide property or order support operates to leave the court without jurisdiction to determine parenting issues. The court disagrees. Ohio has jurisdiction to make an allocation of parental rights and responsibilities in this case notwithstanding this court's lack of *in personam* jurisdiction over defendant/husband for money issues. Ohio derives such authority by virtue of R.C. 3109.04 and The Hague Convention.

### A. OHIO REVISED CODE 3109.04 and UCCJA

51. Without question, *Pasqualone v. Pasqualone* (1980), 63 Ohio St.2d 96, 17 O.O.3d 58, 406 N.E.2d 1121, at paragraph three of the syllabus, held that presence in the state of the child and one parent was not enough, by itself, to give an Illinois court jurisdiction over the Ohio parent in a custody action.

"Ohio courts have placed a limitation upon the exercise of subject matter jurisdiction * * * by holding that decisions impinging on one's right to custody are in personam in nature, and by requiring that the court have personal jurisdiction over the parent whose rights are being adjudicated. * * * In the context of a child custody determination, as in other contexts, the in personam nature of such cases has been held to require minimum contacts with the state before jurisdiction over the person can be exercised." *In re Brooks* (Oct. 8, 1993), Lucas App. No. L–92–152, unreported, at *4, 1993 WL 403542.

Case law has acknowledged, however, that although the defendant must have minimum contacts with the forum for a valid custody determination, the standard for such minimum contacts is somewhat lower than those contacts required in order to impose a support obligation on the defendant: "Although the contacts required to make a binding custody order may not need be as great as those required to order a payment, more contact is required than would be required in a divorce action." *Hostetler v. Kennedy* (1990), 69 Ohio App.3d 299, 302, 590 N.E.2d 793, 794, citing *Pasqualone v. Pasqualone, supra,* 63 Ohio St.2d at 103, 17 O.O.3d at 62, 406 N.E.2d at 1125–1126.

52. It is important to note that the decision in *Pasqualone* followed very quickly after Ohio's adoption of the UCCJA (R.C. 3109.21 through 3109.36), and in the years subsequent to *Pasqualone,* it has grown clear that these statutory provisions and the subsequent Parental Kidnaping Prevention Act of 1980 (the "PKPA"), Pub.L. No. 96–611, 94 Stat. 3568 (1980), Section 1738A(a), Title 28, U.S.Code govern custody jurisdiction.

53. It is time to put to rest the *Pasqualone* decision, since at the time *Pasqualone* and *Hostetler* were decided, Ohio law did not mandate a parenting determination at the time a divorce or legal separation was granted. However, with the adoption of S.B. No. 3, which became effective April 11, 1991, it became *mandatory* for the court to make a parenting determination in any divorce, legal separation, or annulment proceeding in which there were minor children. The language of R.C. 3109.04(A) is unequivocal and provides:

"(A) In any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child, upon hearing the testimony of either or both parents and considering any mediation report filed pursuant to section 3109.052 of the Revised Code and in accordance with section 3109.21 to 3109.36 of the Revised Code, *the court shall allocate the parental rights and responsibilities for the care of the minor children of the marriage.*" (Emphasis added.)

54. R.C. 3109.04, of course, directs us to the allocation of parental rights and responsibilities in accordance with R.C. 3109.21 to 3109.36, the Uniform Child Custody Jurisdiction Act ("UCCJA"), and R.C. 3109.22(A)(1), (2) or (4) specifically grants custody jurisdiction to Ohio.

55. R.C. 2307.382, known as Ohio's long-arm statute, sets forth situations that extend *in personam* jurisdiction, none of which is applicable to custody. However, R.C. 2307.385 specifically states:

"A court of this state may exercise jurisdiction on any other basis authorized in the Revised Code notwithstanding sections 2307.381 to 2307.385, inclusive, of the Revised Code."

Therefore it is clear that R.C. 3109.04, in conjunction with R.C. 2307.385, extends the long-arm jurisdiction to grant *in personam* jurisdiction in all divorce cases *with children,* where application of the UCCJA (R.C. 3109.22) indicates that custody jurisdiction is appropriate.

56. There is no doubt that the commissioners of the UCCJA themselves recognized this jurisdiction:

"There is no requirement for technical personal jurisdiction, on the traditional theory that custody determination, as distinguished from support actions * * * are proceedings affecting status." Comments following Section 12 of the UCCJA.

57. It is also clear that the state of Ohio has a compelling interest to determine custody of all children within its jurisdiction to ensure that the child's needs, physically and financially, and its health, safety, and welfare, are being met. It is routine procedure that mothers come into the courts of Ohio, where they reside with their children, to seek a divorce and custody determination, although fathers may not have sufficient contact with Ohio to determine money issues. Certainly, the very presence of the child in Ohio, which meets the requirements of the UCCJA, makes the necessity of a custody order clear. Mothers can always seek child support through the Uniform Reciprocal Enforcement of Support Act ("URESA"), Family Support Act of 1988, Pub.L. No. 100–485, Section 126(d)(2), 102 Stat. 2354 (codified at Section 666, Title 42, U.S. Code [1991], and as adopted in Ohio, R.C. Chapter 3115).

### B. The Hague Convention

58. While this court finds jurisdiction over the father for custody under Ohio law, the court also finds that The Hague Convention itself in this *international* custody dispute clearly gives Ohio jurisdiction.

59. Since the UCCJA was enacted to mandate the cooperation of sister states in *interstate* custody disputes, it is entirely inapplicable to the *international* custody dispute at hand. Uniform Child Custody Jurisdiction Act, Prefatory Note (1988), 9 U.L.A. 117–118. There is no requirement, therefore, given the inapplicability of the UCCJA to the international context, that the court have *in personam* jurisdiction over a defendant to make an allocation of parental rights and responsibilities. While some states have extended the general policies of the UCCJA to the international arena, Ohio has not promulgated similar provisions in its adoption of the UCCJA. The Parental Kidnapping Prevention Act ("PKPA") is similarly inapplicable to the instant case, since the purposes of the PKPA include (1) the promotion of *interstate* cooperation, (2) the *interstate* enforcement of custody decrees, and (3) the elimination of competition over jurisdiction.

Section 1738A, Title 28, U.S.Code (Congressional Findings and Declaration of Purpose) (1982).

60. The Hague Convention is the body of law which governs this international custody dispute. The Hague Convention serves as the primary means of enforcing custody rights on a global scale. Senate Treaty Doc. No. 11, 99th Cong., 1st Sess., reprinted in 19 I.L.M. 1501 (1980). The goal of The Hague Convention is to litigate the merits of the custody dispute in the place of the child's habitual residence.

61. Therefore, if the UCCJA is inapplicable and The Hague Convention controls, there is no further inquiry into *in personam* jurisdiction over defendant/husband. The court is, therefore, left with the inescapable conclusion that in this matter as "[i]n any * * * legal separation * * * the court *shall* allocate the parental rights and responsibilities for the care of the minor children of the marriage." (Emphasis added.) R.C. 3109.04.

62. Thus, this court has jurisdiction to allocate parental rights and responsibilities for Gabriela's care when addressing the merits of the case.

### VI. Ohio is a Proper Forum and Venue

63. Defendant also urges that this court find itself an "inconvenient forum." That concept as set forth in this case is not relevant as defined in R.C. 3109.25, which compares states, not a state with a foreign country. Further, examination of the facts in this case shows Gabriela and part of her family with a closer connection with Ohio than her father has with Spain. Plaintiff resides in Cuyahoga County and has no plans to leave. As noted above, defendant's employment requires him to travel throughout Europe, and he returned to Spain only in 1994 from employment in Mexico. Certainly substantial evidence concerning Gabriela's future care is not more readily available elsewhere. If, as defendant argues, there is no venue here under Civ.R. 3(B)(1) through (9), venue is proper under Civ.R. 3(B)(10). Defendant's venue challenge lacks merit.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that defendant's motion to dismiss (No. 266863) is hereby denied. Defendant is hereby granted a thirty-day leave to file his responsive pleading(s).

*So ordered.*